**JENNY L. FOLEY, Ph.D., ESQ.**
Nevada Bar No. 9017
E-mail: jfoley@hkm.com
**HKM EMPLOYMENT ATTORNEYS LLP**
1785 East Sahara, Suite 300
Las Vegas, Nevada 89104
Tel: (702) 805-8340
Fax: (702) 805-8340
E-mail: jfoley@hkm.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| SHEILA OBIETA, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>KLONDEX GOLD & SILVER MINING COMPANY, a domestic corporation; DOES I -X; ROE CORPORATIONS I -X.<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT AND JURY DEMAND** |

The Plaintiff Sheila Obieta ("**Plaintiff**") by and through her attorney, Jenny L. Foley, Ph.D., Esq. of HKM Employment Attorneys LLP, hereby complains and alleges as follows:

**JURISDICTION**

1. This is an action for damages brought by Plaintiff for unlawful workplace discrimination based on age, sex, national origin under Title VII of the Civil Rights Act of 1964 ("**Title VII**") and for retaliation under Federal Law, 42 U.S.C. § 2000e-3 and State Law, NRS 613.340.

2. This Court has primary jurisdiction over claims set forth herein pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §1343(a) (4) (civil rights action) and 42 U.S.C. §2000e-5(f)(3) (unlawful discrimination and retaliation in employment). Additionally, this Court has supplemental jurisdiction over any state law claims pled herein pursuant to 28 U.S.C.

§ 1367.

3. All material allegations contained in this Complaint are believed to have occurred in Clark County, Nevada. Therefore, venue properly lies in the southern division of the United States Court for the District of Nevada pursuant to 28 U.S.C. §1391(b)(2).

## EXHAUSTION OF ADMINISTRATIVE REMEDY

4. Plaintiff initiated the process of filing a Charge of Discrimination against her former employer, the Defendant named in this action, with the United States Equal Employment Opportunity Commission ("**EEOC**") wherein she alleged discrimination based on sex and on retaliation.

5. On or about July 30, 2020, Plaintiff received her Notice of Right to Sue from the EEOC.

6. This action is timely filed pursuant to 42 U.S.C. § 2000e-5(f).

7. Plaintiff has exhausted her administrative remedy on all claims pled hereunder prior to filing this action with this Court.

## GENERAL ALLEGATIONS

8. Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

9. Plaintiff is a United States citizen and current resident of Battle Mountain, Nevada.

10. Defendant KLONDEX GOLD & SILVER MINING COMPANY ("Defendant") is a domestic corporation and an employer in the State of Nevada.

11. At all times relevant to this matter, Defendant had well over 100 employees, and is therefore subject to the provisions of Title VII.

12. Plaintiff first began her employment with Defendant in October 2017 as a Warehouse Tech at the Midas location. Not long after, she transferred to dispatch at the same location, and then to the Hollister location as a Dispatcher.

13. In October 2018, Plaintiff began working as a "Nipper" at the Fire Creek Mine, which is essentially a runner who assists underground mine crews.

14. During Plaintiff's entire time working for Defendant, Plaintiff had no write-ups nor any disciplinary issues.

15. On or about November 11, 2018, while on the job, Plaintiff received a call from Tony Timbrel, a Mine Production General Foreman at the Fire Creek Mine and Plaintiff's supervisor, regarding a trip off site to look for a part they needed which Mr. Timbrel said was at the Barrick Mine.

16. When Mr. Timbrel picked Plaintiff up, he asked if she felt like drinking, and Plaintiff declined. Mr. Timbrel then offered her some Gatorade, but Plaintiff stated that it smelled like alcohol and once again declined.

17. Upon leaving the Fire Creek Mine, Mr. Timbrel drove both of them to a convenience store in Crescent Valley, NV, where Mr. Timbrel purchased a bottle of vodka.

18. Instead of heading to the Barrick Mine, Mr. Timbrel told Plaintiff that they needed to go to a friend's house because they had the filter that he needed. They went to a trailer inside of a trailer park where Plaintiff met two unknown men. One of the men offered Plaintiff an alcoholic drink, but Plaintiff did not want to drink and asked Mr. Timbrel to leave.

19. Mr. Timbrel told Plaintiff that he did not want to leave and told Plaintiff to have a drink, at which point she did have a drink. Plaintiff believes that she only had two drinks while there, despite being there for over two hours.

20. Every time Plaintiff finished one of her drinks, Mr. Timbrel would immediately try to give her another drink. When Mr. Timbrel gave Plaintiff another drink, she went to the restroom to pour it out.

21. While Plaintiff was in the restroom Mr. Timbrel came up behind her and put his hand up her Plaintiff's shirt. He then asked her to come lay in one of the bedrooms with her. Plaintiff refused and asked to leave.

22. They left and headed to the Barrick Mine, but before arriving, Mr. Timbrel had to pull over and vomit. They never made it to the Barrick Mine because one of the Barraick security guards pulled them over. The security guard and Mr. Timbrel had a conversation, at which point Plaintiff asked to be taken back to her truck at the Fire Creek Mine.

Page **3** of **11**

23. After speaking with the security guard, they turned around and headed back towards Crescent Valley. However, Mr. Timbrel was intoxicated, and so he pulled over and passed out. Plaintiff called her son to come pick her up, but before he arrived, Mr. Timbrel woke up and drove her back to her truck.

24. There were at least three other incidents where Mr. Timbrel took women offsite and offered them alcohol.

25. Upon information and belief, on November 16 or 17, 2020, Ashley Bundrock, an American Mine & Tunneling Truck Driver, was having mechanical issues with her haul truck, and Mr. Timbrel told her they could go together to get the parts to repair it. However, when he got word that the parts had already been picked up, Mr. Timbrel asked if Ms. Bundrock wanted to go to a bar for some beers.

26. Even though Ms. Bundrock declined, Mr. Timbrel drove them to a bar anyway. Mr. Timbrel drank beers while Ms. Bundrock just sat there until Mr. Timbrel dropped her off.

27. Upon information and belief, a similar incident occurred with Cassi Warren, a Nipper on a different crew than Plaintiff's.

28. On November 23, 2018, during working hours, Mr. Timbrel told Ms. Warren that they needed to go help with a derailment that occurred in Beowawe. However, Mr. Timbrel instead drove them to the Gold Dust West Casino in Elko. Mr. Timbrel asked if she wanted a drink, but Ms. Warren declined.

29. On their way back they stopped at a convenience store. When Ms. Warren returned from the bathroom, she went to take a drink of Gatorade and noticed that it smelled like alcohol. She then told Mr. Timbrel to take her to her sister's and bother-in-law's house.

30. Ms. Warren's brother-in-law, Daren Weber, also works for Defendant as the Head of Mr. Warren's crew. Mr. Weber had called in sick that day and so he was at home when Ms. Warren and Mr. Timbrel came, which was during normal working hours.

31. When Ms. Warren and Mr. Timbrel sat down at the dining room table, Mr. Timbrel put his hand on her thigh.

32. Upon information and belief, Mr. Weber witnessed Mr. Timbrel inappropriately

1  touch Ms. Warren.

2      33. Upon information and belief, a similar situation occurred involving Mr. Timbrel
3  and Allie Conoby, who started out as a Security guard for Defendant before becoming a Truck
4  Driver.

5      34. Although the exact date is unknown, on one occasion, although outside of
6  working hours, Mr. Timbrel took Ms. Conoby to a bar and put his hand on her thigh.

7      35. Upon information and belief, one time when Mr. Timbrel took Ms. Conoby
8  offsite, he drove straight through the exit gate without stopping, significantly damaging it.

9      36. Following these incidents, on December 5, 2018, Defendant received a report
10 that Mr. Timbrel has been behaving erratically. Defendant began an investigation into Mr.
11 Timbrel.

12     37. This report was not submitted by Plaintiff as she was just trying to focus on her
13 work and not start any trouble.

14     38. In the morning of December 10, 2018, Plaintiff was called in to meet with
15 Human Resources Supervisor Liaz Diaz and General Manager Sid Tolbert.

16     39. Plaintiff explained her incident involving Mr. Timbrel., and also stated that she
17 knew of Mr. Timbrel taking Ms. Bundrock and Ms. Warren offsite as well.

18     40. Later in the afternoon of that same day, Plaintiff spoke with Ms. Diaz and Mr.
19 Tolbert again, who asked Plaintiff if that was the only time she had gone offsite with Mr.
20 Timbrel. Plaintiff stated that it was the only time.

21     41. Further, they asked Plaintiff whether she felt as if Mr. Timbrel had assaulted her.
22 Plaintiff affirmed that she felt as if Mr. Timbrel had assaulted her, but she stated that she did
23 not want to report this to the authorities because she just wanted to go back to work and do her
24 job.

25     42. On or about December 11, 2018, Mr. Timbrel was terminated.

26     43. Following Mr. Timbrel's termination, Plaintiff was met with hostility from
27 other coworkers not only because they blamed her for his termination but also because of her
28 sex.

44. On or about February 19, a rock fell on a forklift that Plaintiff was operating and spiderwebbed the window. This particular forklift had previous issues where the forklift would randomly shut down and drop the man-basket.

45. A contracted mechanic, Corbin LNU, was present and got the forklift started. The lead of the Plaintiff's crew, Greg LNU, then asked why he was needed there, and Plaintiff stated that she thought the situation needed to be reported.

46. Plaintiff then asked Corbin LNU if he knew that this incident had not been reported, to which he replied that he now knew.

47. Greg LNU told Plaintiff to "quit fucking off" and that she needed to go down to spiral 3 and help them.

48. Plaintiff started heading down but when she reached spiral 2 the ventilation hit and cracked the window entirely on the forklift. Plaintiff tried to call Greg LNU and her Shift Supervisor, Owen LNU, to report what happened, but they did not answer.

49. She was going to shut down the machine and remove it from use but Seth Moses, another crew member, said she could not do that because it would block them in the tunnel. So, Corbin LNU cleaned out the broken glass and the forklift was moved to a bay.

50. Plaintiff went to help with the scissor deck, which also had mechanical issues and kept shutting down. When Plaintiff went to help, Greg LNU told her to quit "fucking around with the scissor deck" and use the "fucking forklift."

51. Plaintiff explained that the forklift kept shutting down and that someone is going to get stuck in the air.

52. Despite Plaintiff's assertions that someone could get hurt, Plaintiff was forced to use the malfunctioning and damaged forklift. Plaintiff drove the forklift and approximately three minutes later Mr. Moses got stuck on the man-basket.

53. Mr. Moses jumped down and exclaimed to Plaintiff to "get the fuck out. You [Plaintiff] can't drive a forklift." Plaintiff said "fine" and then walked to the top of the spiral.

54. Afterwards, Plaintiff met with another crew member before riding around with Corbin LNU until she could get into contact with her main supervisor, Tim Felzien.

55. Sometime after, Plaintiff was riding around with Jack LNU, a Nipper on Plaintiff's crew, who said to her, "do you ever think that we think you guys [the women] should have been let go with Tony [Mr. Timbrel]?" "You guys [the women] were drinking too."

56. Plaintiff asked Jack LNU if he even knew what happened or what was involved, but Jack admitted that he did not know and only heard what happened.

57. Plaintiff pointed out that it was hearsay, but Jack replied, "you guys [the women] are flirtatious by nature." Plaintiff pointed out that she has never even slightly flirted with Jack LNU, as well as stating that her and Ms. Warren are single moms only there to work and put food on the table.

58. Jack LNU continued, stating that the men have to pick Plaintiff's and Ms. Warren's slack since they could not bring the "wire down." The "wire" is a metal mine mesh that protects the miners from rocks while mining.

59. However, Mr. Felzien does not like anyone bringing the wire on the forklift and he wants it brought down in a bucket, which neither Plaintiff nor Ms. Warren were permitted to drive.

60. Plaintiff reported this incident the very next day, on February 20, 2018, to Mr. Felzien who then informed Ms. Diaz in Human Resources. However, because of Plaintiff's work schedule, seven days on and seven days off, Human Resources offered to meet with Plaintiff onsite during her next rotation, to which Plaintiff agreed.

61. During this meeting on March 4, 2019, Plaintiff explained that fellow employees were blaming her for Mr. Timbre's termination.

62. She also reported that several male employees made comments either explicitly or implicitly that women do not belong underground or in the profession. Plaintiff did not initially want to give names because she knew it would only further increase the hostility aimed at her.

63. On or around March 14, 2019, Plaintiff called Human Resources stating that she "thought that it is supposed to be confidential when you talk to HR," because many employees knew that she spoke to HR not only because of the incident with Mr. Timbrel, but also because

they saw HR meeting with her onsite.

64. Plaintiff further explained that she received several text messages from fellow employees claiming that she was getting everyone in trouble.

65. During the same discussion, Plaintiff reported that she received text messages referring to explicit graffiti that was written about her in one the Porta-Potties.

66. On or about March 15, 2020, Plaintiff was forced to leave her position after several more hostile incidents.

67. Plaintiff spoke with HR and stated that after Mr. Timbrel's termination, her current crew, which was supervised by Owen LNU, were hostile toward her.

68. Specifically, Plaintiff stated that several employees told her that (1) she did not belong there because of her gender; (2) she was the reason Mr. Timbrel was terminated; (3) and that she was the reason that bonuses were lower.

69. In addition, the crew would even refuse to answer her on the radio.

70. These incidences happened within Defendant's mines' corridors while Plaintiff was performing her job.

71. Plaintiff gave Defendant sufficient notice that she was being mistreated, and she participated in the investigative process in good faith and to a reasonable extent.

72. However, because of Defendant's actions in handling this matter, the hostility only increased, forcing Plaintiff's termination of employment.

73. Upon information and belief, during Plaintiff's employment at Defendants, there were about 7 women out of the approximately 200 hundred crew members working in the mines. In other words, less 4% of Defendant's employees were women.

**PLAINTIFF'S EMPLOYMENT WITH DEFENDANT**

74. Plaintiff has been a model employee since she began working for Defendant.

75. Plaintiff has had no disciplinary issues during her employment.

76. Upon information and belief, Defendant intentionally discriminated against Plaintiff based on her sex, female, by allowing, enabling, and failing to rectify a hostile work environment toward women, even after Plaintiff reported it.

77. Upon information and belief, Defendant unlawfully retaliated against Plaintiff for speaking with HR regarding the incident and termination of Mr. Timbrel as well as for reporting the ongoing hostility toward Plaintiff because of her gender.

78. Plaintiff had no other option but to leave due to the ongoing retaliatory behavior and harassment.

## FIRST CAUSE OF ACTION

**(Discrimination Based on Sex in violation of State and Federal Statutes)**

79. Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

80. Plaintiff is a member of the class of persons protected by state and federal statutes prohibiting discrimination based on sex.

81. Defendant as an employer is subject to Nevada and federal statutes prohibiting discrimination, NRS 613.330 et. seq., Age Discrimination in Employment Act, 29 USC §621, Title VII, 42 U.S.C. § 2000e et. seq. as amended and thus, has a legal obligation to provide Plaintiff and all employees a working environment free from discrimination.

82. Defendant discriminated against Plaintiff when it failed to treat her the same way as similarly situated employees not of Plaintiff's protected class.

83. No other similarly situated persons, not of Plaintiff's protected class were subject to the same or substantially similar conduct.

84. Plaintiff suffered adverse economic impact due to mistreatment and hostility while working with certain crews and not being able to work on certain crews.

85. Plaintiff was embarrassed, humiliated, angered and discouraged by the discriminatory actions taken against her.

86. Plaintiff suffered compensable emotional and physical harm, including but not limited to, headaches, sleeplessness, anxiety, and depression resulting from this unlawful discrimination by her employer.

87. Plaintiff is entitled to be fully compensated for her emotional disturbance by being forced to endure this discrimination.

88. Pursuant to 1991 Amendments to Title VII, Plaintiff is entitled to recover punitive damages for Defendant's intentional repeated violations of federal and state civil rights laws.

89. Plaintiff suffered damages in an amount deemed sufficient by the jury.

90. Plaintiff is entitled to an award of reasonable attorney's fees.

91. Defendant is guilty of oppression, fraud or malice, express or implied as Defendant knowingly and intentionally discriminated against Plaintiff because of her sex.

92. Therefore, Plaintiff is entitled to recover damages for the sake of example, to deter other employers from engaging in such conduct and by way of punishing the Defendant in an amount deemed sufficient by the jury.

## SECOND CAUSE OF ACTION

**(Retaliation under Federal Law, 42 U.S.C. § 2000e-3 and State Law, NRS 613.340)**

93. Plaintiff incorporates all of the allegations in the preceding paragraphs as though fully set forth herein.

94. In violation of 42 U.S.C § 200e-3, Defendant retaliated against Plaintiff after she complained of acts which she reasonably believed were discriminatory.

95. In violation of NRS 613.340 Defendant retaliated against Plaintiff after she complained of acts, which she reasonably believed were discriminatory.

96. There may be more detrimental acts of which Plaintiff is unaware which may also constitute retaliation in that it harmed Plaintiff.

97. The actions and conduct by Defendant constitute illegal retaliation which is prohibited by federal and state statutes.

98. Plaintiff suffered damages in an amount deemed sufficient by the jury.

99. Plaintiff is entitled to an award of reasonable attorney's fees.

100. Defendant is guilty of oppression, fraud or malice, express or implied because Defendant knowingly and intentionally retaliated against Plaintiff because she complained of acts she considered retaliatory.

101. Therefore, Plaintiff is entitled to recover damages for the sake of example, to

deter other employers from engaging in such conduct and by way of punishing the Defendant in an amount deemed sufficient by the jury.

**WHEREFORE,** Plaintiff prays this court for:

a. A jury trial on all appropriate claims;

moreover, to enter judgment in favor of the Plaintiff by:

b. Awarding Plaintiff an amount sufficient to fully compensate her (including tax consequences) for all economic losses of any kind, and otherwise make her whole in accordance with Title VI;

c. General damages;

d. Special damages;

e. An award of compensatory and punitive damages to be determined at trial;

f. Pre- and post-judgment interest;

g. An award of attorney's fees and costs; and

h. Any other relief the court deems just and proper.

Dated this 28th Day of October, 2020.

                        **HKM EMPLOYMENT ATTORNEYS, LLP**

*/s/ Jenny L. Foley*
**JENNY L. FOLEY, Ph.D., Esq.**
Nevada Bar No. 9017
1785 East Sahara, Suite 300
Las Vegas, Nevada 89104
Tel: (702) 805-8340
Fax: (702) 805-8340
E-mail: jfoley@hkm.com
*Attorney for Plaintiff*